2003 WY 74

Carmen BORNS, a minor, by and through her next best friend and mother, Michelle GANNON, Appellant (Plaintiff),

v.

Clayton VOSS and Mitsy Voss, individually and d/b/a Lazy TX Outfitters, Appellees (Defendants).

No. 02–139.

Supreme Court of Wyoming.

June 6, 2003.

Representing Appellant: James L. Edwards and Patrick E. Carpenter of Stevens, Edwards & Hallock, P.C., Gillette, Wyoming.

Representing Appellees: Patrick J. Murphy and Jason A. Neville of Williams, Porter, Day & Neville, P.C., Casper, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] This is an appeal from an order granting summary judgment to the defendants in a dog bite case. The district court concluded that there were no genuine issues of material fact, that the defendants had no prior knowledge that their dog was vicious or possessed other dangerous propensities, and that the defendants, therefore, owed no duty to the plaintiff.

[¶ 2] We reverse.

### ISSUES

1. Was summary judgment improper because of the existence of genuine issues of material fact?

2. Were the appellees entitled to summary judgment as a matter of law?

3. Should the "one free bite" rule be abrogated?

### STANDARD OF REVIEW

[¶ 3] Summary judgment motions are governed by W.R.C.P. 56. We review summary judgments under the following standard:

Summary judgment is appropriate when no genuine issue as to any material fact exists and the prevailing party is entitled to judgment as a matter of law. *Matlack v. Mountain West Farm Bureau Mutual Insurance Company*, 2002 WY 60, ¶ 6, 44 P.3d 73, ¶ 6 (Wyo.2002). A genuine issue of material fact exists when a disputed fact, if it were proven, would have the effect of establishing or refuting an essential element of the cause of action or defense which the parties have asserted. *Id.* We examine the record from the vantage point most favorable to the party who op-

posed the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record. *Id.* We evaluate the propriety of a summary judgment using the same standards and materials as the lower court used. *Id.* We do not accord deference to the district court's decisions on issues of law. *Id.*

*T.M. ex rel. Cox v. Executive Risk Indem., Inc.,* 2002 WY 179, ¶ 7, 59 P.3d 721, 724 (Wyo.2002).

### FACTS

[¶ 4] Clayton Voss and Mitsy Voss do business as Lazy TX Outfitters. Collectively, they are the appellees in this case. As part of their business, the Vosses had established the "Down's Fork" camp in the Wind River Mountains. Jim Borns (Borns) was employed by the Vosses. At the time of the incident that gave rise to this case, Borns had been camping with his children, Carmen and Sam, at Down's Fork for a week or two. Carmen, who was seven years old at the time, is the appellant herein.

[¶ 5] On July 18, 1999, the Vosses, along with their male Red Heeler dog, Tramp, arrived in camp. They were accompanied by another employee, Ron Penny (Penny). Clayton Voss testified that he had been in and out of the camp several times in the preceding days.[1] Both of the Vosses testified that on at least two prior occasions in the camp, they had seen Carmen mistreating Tramp. Clayton Voss testified that twice he had seen Carmen hitting Tramp on the back, at least once with a stick, and that on both occasions he had told her "not to do that." Mitsy Voss testified that she had seen Carmen both kick the dog "in the rear end" and hit him on the face, and that she had told Carmen "that was not something we do." Penny testified similarly, indicating that on five or six occasions he had seen Carmen slap the dog and "tell him no." He further testified that, while he had said something to Carmen at least once about her conduct, he doubted that he had mentioned the incidents to the Vosses.

[¶ 6] As proof that the Vosses had prior knowledge of Tramp's dangerous propensities, Carmen submitted the affidavit of her father, who described both an initial warning about Tramp from Clayton Voss and a later experience he had with Tramp:

3. That shortly after becoming employed by the defendants, Clayton Voss warned me to be careful around his dog, Tramp. Mr. Voss indicated that it might take his dog some time to become accustomed to me. I understood my conversation with Mr. Voss to mean that I should be careful around his dog until I get acquainted with the dog. It was also my understanding that until the dog became accustomed to me, there was a chance that the dog might act aggressively toward me.

4. That about August 1998, I was attempting to unload some gear from the bed of Clayton Voss' pickup truck. The defendants' dog was standing on my gear in the bed of the truck. When I attempted to move the dog so that I could retrieve my gear, the dog spun around toward me and tried to bite my hand. Fortunately, after my conversation with Mr. Voss, I was prepared for such an event and I was able to move my hand before the dog could bite me. Mr. Voss was present at the time this happened.

[¶ 7] Witness accounts of the biting incident, itself, differ. Carmen testified that she was standing at Tramp's side and was leaning down and petting him. She had just told Tramp that he could not go into the cook's tent when he suddenly growled, lunged at her, and bit her on the face. Carmen's father had to pry Tramp's jaws open to release his grip on her face. Penny testified that he saw the kids playing with a Frisbee and saw Tramp trying to play with them.[2] Carmen was slapping Tramp on the head and telling him no when Tramp bit her. A third witness, Marette Nagel, who was also employed by the Vosses, testified that she saw Carmen scolding or reprimanding Tramp for about two full minutes before Tramp bit Carmen. Nagel described watching Carmen lean down

1. The witness testimony described herein is deposition testimony.

2. There were other children in the camp besides Carmen and Sam Borns.

and shake her finger in Tramp's face, but she did not see Carmen hit Tramp.

## WYOMING'S DOG BITE LAW

[¶ 8] This Court has applied Wyoming's dog bite law several times in the past. In doing so, we have recognized three distinct theories of recovery: (1) the common law theory of strict liability of an owner who keeps an animal knowing of its dangerous propensities as articulated in Restatement (Second) Torts § 509 (1977);[3] (2) the common law theory of negligence in the care and control of a domestic animal; and (3) a theory of negligence based on the violation of a duty created by statute or ordinance not to allow a domestic animal to run at large. *Williams v. Johnson*, 781 P.2d 922, 923 (Wyo.1989). Because we have not always been careful to maintain the distinctions among these causes of action, especially as to the *scienter* element, and because we are being asked to modify the existing law, we will address each major case, so that we may first establish what the existing law is.

[¶ 9] In *McCarthy v. Croker*, 549 P.2d 323, 325 (Wyo.1976), dismissal was granted at the end of the plaintiff's case on the ground that the defendant's knowledge that his dog had nipped at a neighbor's horse did not create an inference that the plaintiff knew the dog had a propensity to bite humans. The allegation in the complaint had been that the defendant " 'wrongfully kept a dog, well knowing him to be of a ferocious, vicious and mischievous disposition and accustomed to attach [sic] and bite man kind [sic].' " *Id.* at 324. In affirming the dismissal, this Court agreed with the statement that " '[t]he determinative factor in the present case is knowledge of vicious propensities....' " *Id.* While we did not, in support of that statement, specify the particular cause of action to which it applied, it is clear that the theory to which

it applies is strict liability. In discussing the knowledge or *scienter* requirement, we cited to Prosser, Torts, § 76 at 501 (4th ed.1971), which contains a discussion of animals within a chapter entitled "Strict Liability." *McCarthy*, 549 P.2d at 325. In that discussion, Professor Prosser clearly states the difference between the two torts in this context: "And *scienter* is of course not required where any negligence can be shown in the keeping or control of the animal." Prosser, Torts, *supra*, § 76 at 502.

[¶ 10] A second case in the 1970's, if not read carefully, may seem to blur the line between the strict liability and negligence causes of action. The plaintiff in *Endresen v. Allen*, 574 P.2d 1219, 1220–21 (Wyo.1978), was injured when his motorcycle struck the defendants' dog while the dog chased the motorcycle down the street. The plaintiff sought to recover under theories of common-law negligence and violation of an ordinance forbidding dogs running at large. The opinion reversing summary judgment in favor of the defendants was based on the negligence theory, but a discussion of the defendants' prior knowledge of their dog's propensity to escape from their yard sounds much like a discussion of the *scienter* element under strict liability. *Id.* at 1221–22.[4] Indeed, the defendants cited *McCarthy* in support of their argument, causing us to comment that this "misses the point that we are not concerned with the vicious propensities of the dog but only whether defendants" could have foreseen the plaintiff's injury. *Endresen*, 574 P.2d at 1222. Unfortunately, the confusion among causes of action is heightened by the fact that, while later discussing whether both defendants could be liable when only one of them left the dog untied, we did state that "the common-law duty to protect against harmful propensities of the animal is one that is imposed upon the owners or keepers of the animal without regard to negligence except

---

**3.** Restatement (Second) Torts, *supra*, § 509 reads:

(1) A possessor of a domestic animal that he knows or has reason to know has dangerous propensities abnormal to its class, is subject to liability for harm done by the animal to another, although he has exercised the utmost care to prevent it from doing the harm.

(2) This liability is limited to harm that results from the abnormally dangerous propensity of which the possessor knows or has reason to know.

**4.** *Endresen*, 574 P.2d at 1222–26, goes on to analyze the cause of action for violating a city ordinance. Because that issue is not raised in the present case, we will not address it further.

that there must be knowledge of the propensities." *Id.* at 1226. That, of course, is a statement of the strict liability cause of action. Since that cause of action was not raised in *Endresen*, the statement is, at most, *obiter dictum.*

[¶ 11] Three years after *Endresen*, we decided *Larsen v. City of Cheyenne*, 626 P.2d 558 (Wyo.1981). The primary issue in *Larsen* was whether a city dog pound should be liable for releasing a dog known to be vicious. The action was founded in negligence, based upon the alleged violation of certain city ordinances. *Id.* at 560. Our affirmance of the summary judgment entered in favor of the defendant city was based upon the conclusion that the particular ordinances had not created a duty on the part of the city. *Id.* at 560–61. In reaching that conclusion, however, we noted that a duty on the part of the city to conduct the pound activities in a manner that would protect the general public was not just inferable from the ordinances, but could arise under a standard negligence theory:

> Appellant's argument also pertains to a contention that there was a failure on the part of appellees to act reasonably under the circumstances. The question of reasonableness comes into play in a negligence action in connection with the violation of a duty. If there is no duty, the proposition is not reached. The elements of a negligence action are: a duty on the part of the defendant, failure to perform the duty, proximately causing damage to plaintiff. *Danculovich v. Brown*, Wyo., 593 P.2d 187 (1979).

*Larsen*, 626 P.2d at 560 n. 2. Finally, in a brief analysis of the strict liability theory of recovery, we also found that the city was neither the owner nor the keeper of the dog at the time of the biting incident. *Id.* at 560. As with *Endresen*, this interposing of a discussion of strict liability in the midst of a case brought in negligence did not help to keep the causes of action distinct.

[¶ 12] In *Abelseth v. City of Gillette*, 752 P.2d 430, 431 (Wyo.1988), the plaintiff was bitten by a police dog and sued the city. This Court clearly indicated that strict liability and negligence are separate theories of recovery in dog bite cases, and that an allegation of harboring a dog known to be dangerous is a claim under the former theory. *Id.* at 431–34. The plaintiff's negligence claim against the city was allowed to proceed, while dismissal of the strict liability claim under the Wyoming Governmental Claims Act, Wyo. Stat. Ann. §§ 1–39–101 through 1–39–120 (Michie 1987), was affirmed. We held that use of the phrase "strict liability" is not determinative of the nature of a claim; rather, the question is whether the complaint raises the elements of a cause of action under Restatement (Second) Torts, *supra*, § 509. *Abelseth*, 752 P.2d at 434.

[¶ 13] We previously herein cited *Williams*, 781 P.2d at 923, as recognizing the three distinct theories of recovery in dog bite cases in Wyoming. Unfortunately, rather than clarifying those theories of recovery, *Williams* continued to muddy the waters. The plaintiff in *Williams* was a mailman who was attacked by the defendants' dogs on a neighbor's porch. He was not bitten, but he injured his knee in trying to escape from the attack. *Id.* His complaint generally alleged liability but did not rely upon any particular theory of recovery. *Id.* That omission led to this Court's analysis of the three separate causes of action. To the extent that part of that analysis was wrong, it must now be overturned.

[¶ 14] In *Williams*, we correctly identified the two common law causes of action—strict liability and negligence.[5] *Id.* However, we then went on to make the following mistaken statement as to the law:

> Common to both of these causes of action are certain facts which must be put in issue to defeat defendant's summary judgment motion, i.e., (1) the owner, (2) of an animal with a propensity for potentially harmful behavior, (3) must know of that propensity, and (4) such behavior must be the proximate cause of injury to the plaintiff. In this case, appellees denied knowl-

---

5. A cause of action based on violation of a city ordinance was also discussed, but its resolution is not pertinent to the present issue.

edge of harmful propensities. Appellant claimed knowledge of dangerous propensities was unnecessary to a common law cause of action. Appellant therefore failed to assert facts, by affidavit or otherwise, which would place in issue appellees' knowledge of the vicious nature of their dogs. This was fatal to his maintaining a cause of action under these common law theories. His suit was premised on these theories, and the district court, therefore, correctly granted appellees' summary judgment motion.

*Id.* at 924. As pointed out by Justice Urbigkit in his dissenting opinion in *Williams,* this formulation of the law is incorrect because "the requirement of knowledge of propensity is confined to a strict liability basis for asserted recovery." *Id.* at 927 (Urbigkit, J., dissenting). This is consistent with Professor Prosser's view of these torts, as cited above. The majority's requirement of the *scienter* element in the negligence claim was contrary to law.

[¶ 15] The 1997 case of *Turcq v. Shanahan,* 950 P.2d 47 (Wyo.1997), once again clearly recognized the three separate causes of action. In *Turcq,* the plaintiff was an animal control officer who was severely bitten by the defendant's dog when she responded to a barking dog complaint. She had previously responded five times to similar complaints involving the same dog. *Id.* at 49–50. A strict liability claim was dismissed via summary judgment, and the case went to trial strictly as a negligence case. *Id.* at 50. For our present purposes, the most significant feature of *Turcq* is its application of standard negligence law:

> By our decisions, the elements of a negligence claim are firmly established as: 1) a duty owed by the defendant to the plaintiff; 2) a breach of that duty by the defendant; 3) the breach is the proximate cause; 4) of injuries to the plaintiff. *Vasquez By and Through Vasquez v. Wal–Mart Stores, Inc.,* 913 P.2d 441, 443 (Wyo.1996); *Downen v. Sinclair Oil Corp.,* 887 P.2d 515, 520 (Wyo.1994).

*Turcq,* 950 P.2d at 51. Clearly, common law negligence in a dog bite case is no different than in any other case. In *Turcq,* as in

*Endresen,* the key issue was the foreseeability of injury. Specifically, the issue was whether the defendant's failure to prevent her dog from barking was a proximate cause of the plaintiff's injuries. *Turcq,* 950 P.2d at 52. We must reiterate that it is important to distinguish between the analysis of knowledge of a dangerous propensity, which applies to strict liability cases, and the analysis of foreseeability of harm, which applies to negligence cases.

[¶ 16] Our most recent precedent involving a dog bite is *Roberts v. Klinkosh,* 986 P.2d 153 (Wyo.1999). In *Roberts,* a tenant's social guest sued the tenant's landlord after the guest was bitten by another tenant's Pit Bull. *Id.* at 155. The plaintiff raised both strict liability and negligence claims. The defendant obtained summary judgment on the grounds that he had no duty toward the plaintiff because he had no knowledge of the dog's dangerousness, and because the attack took place at the tenant's doorstep, an area not under the landlord's control. *Id.* We affirmed the summary judgment as to the negligence claim through the application of standard landlord-tenant law. As to the strict liability claim, we concluded that neither the landlord's knowledge that the dog had previously growled at one person nor his knowledge that Pit Bulls, as a breed, are dangerous, was sufficient to create a duty in him to protect the social guest. *Id.* at 157.

[¶ 17] *Roberts* is of limited precedential value for our present purposes because its holdings are stated in the context of landlord-tenant liability rather than in the context of an owner or keeper of a dog. Specifically, the discussion in *Roberts* about knowledge of a dangerous propensity focuses upon what a landlord must know about a tenant's dog before the landlord's failure to have the dog removed from the premises becomes a breach of a duty owed to a social guest. Furthermore, as with some of our earlier cases, neither the parties nor this Court maintained a clear line between the strict liability and negligence theories. *Id.* at 157. To the extent that *Roberts* may suggest that knowledge of dangerous propensities is an element that must be proved

in a common law negligence case, it is in error and must be overruled.

[¶ 18] Before we attempt to discuss the parties' factual and legal contentions in the present case, it is necessary that we now summarize existing dog bite law in Wyoming. There are three theories of recovery: (1) common law negligence; (2) common law strict liability as articulated in Restatement (Second) Torts, *supra*, § 509; and (3) negligence based upon violation of a duty created by statute or ordinance. The elements of the common law negligence cause of action are the same as the elements of a standard negligence claim; that is, duty, breach, cause and resulting damage. This theory has often been described as negligence in the care and control of a domestic animal. *Turcq*, 950 P.2d at 52; *Williams*, 781 P.2d at 923. The nature of the duty is as follows:

> Even in the absence of any known viciousness in a domestic animal, its owner is obliged to exercise over it a certain degree of care depending upon the kind and character of the particular animal concerned, the circumstances in which it is placed, and the purposes for which it is employed or kept. The owner or keeper of a domestic animal is charged with knowledge of the natural propensities of animals of the particular class to which this animal belongs, and, if these propensities are of the kind that might cause injury he must exercise the care necessary to prevent such injuries as may be anticipated.

4 Am.Jur.2d *Animals* § 102 at 439 (1995). A concise statement of this duty is found in Restatement (Second) Torts, *supra*, § 518:

> Except for animal trespass, one who possesses or harbors a domestic animal that he does not know or have reason to know to be abnormally dangerous, is subject to liability for harm done by the animal if, but only if,
>
> (a) he intentionally causes the animal to do the harm, or
>
> (b) he is negligent in failing to prevent the harm.

As in other negligence actions, the degree of care required is that which is reasonable under the circumstances. *Larsen*, 626 P.2d at 560 n. 2; *Slack v. Villari*, 59 Md.App. 462, 476 A.2d 227, 231, *cert. denied*, 301 Md. 177, 482 A.2d 502 (1984).

[¶ 19] The distinguishing feature of strict liability is that a possessor of a domestic animal that he knows or has reason to know has a dangerous propensity is liable for harm done by the animal that results from that dangerous propensity, even if negligence cannot be proven. And the distinguishing feature of negligence based upon violation of a statute or ordinance is simply that the duty allegedly breached is a legislatively created duty rather than a duty recognized at common law. *Williams*, 781 P.2d at 923.

## DISCUSSION

[¶ 20] We have concluded that the summary judgment granted to the Vosses in this case must be reversed. To begin with, the Vosses are wrong about the law, as is evidenced by three contentions in their appellate brief. First, the Vosses state that "because Appellees had no prior knowledge that their dog might react to Appellant's mistreatment, they were charged with no legal duty to protect Appellant from this unknown risk." Next, the Vosses contend that "[b]ecause Appellees possessed no *scienter* of Tramp's viciousness or propensity to cause harm, it was wholly unforeseeable that their dog would bite any human being, and consequently Appellees had no legal duty to protect Appellant Carmen Borns." Third, the Vosses contend that "[w]hat Appellant fails to understand is that, under the common law negligence standard, a dog owner is not charged with a duty **until** he possesses *scienter* of his dog's dangerous propensity to cause harm." The first statement erroneously says, in effect, that if strict liability does not apply, there can be no negligence claim. The second statement fails to recognize the *Endresen* and *Turcq* distinction between knowledge of dangerous propensities under strict liability and foreseeability under negligence. And the third statement completely negates any distinction between negligence and strict liability. The summary judgment should not have been granted because it is based on these same erroneous conclusions.

[¶ 21] The second reason that this summary judgment must be reversed is that there are genuine issues of material fact related to both claims. As to the strict liability claim, the affidavit of Jim Borns sufficiently places at issue the question of whether Clayton Voss was or was not aware of Tramp's alleged "attack" upon Borns, especially because Borns testified that Voss specifically warned him about Tramp. The facts necessary to defeat summary judgment do not have to be conclusive or unopposed; it is enough that they are competent and material and there are sufficient specific facts to indicate the presence of a genuine issue of material fact. *Blackmore v. Davis Oil Co.*, 671 P.2d 334, 336 (Wyo.1983); *Cantonwine v. Fehling*, 582 P.2d 592, 598 (Wyo.1978). As to the negligence claim, the evidence viewed in the light most favorable to Carmen suggests that the Vosses were aware of Tramp's unfriendly disposition, were aware of Carmen's repeated inappropriate interaction with Tramp, were aware that Carmen was in camp when Tramp was brought into camp, and were aware at the time of the attack that Carmen was at that moment mistreating Tramp, yet they did nothing to prevent Tramp from biting Carmen.

[¶ 22] The primary difficulty with the Vosses' position is their belief that the "one free bite rule" creates immunity from any liability for their dog's behavior absent knowledge of that first bite. In truth, the appellation "one free bite" is quite a misnomer, inasmuch as it—being the *scienter* element of the strict liability cause of action— actually creates liability where it would not otherwise exist. The "one free bite" rule takes nothing away from the common law negligence theory of recovery. Consequently, if Carmen can prove that, under all the circumstances, the Vosses violated their duty to her of reasonable care in the control of Tramp, liability may result even if they had no knowledge of Tramp's propensity to bite people, or indeed, even if Tramp had no such propensity.[6] In the instant case, a jury could find that the Vosses did not do enough to control Tramp to prevent injury to Carmen. Summary judgments are not favored in negligence actions where the question is whether the defendant's conduct violated the required duty. *Bancroft v. Jagusch*, 611 P.2d 819, 821 (Wyo.1980).

[¶ 23] We have determined that this case must be reversed because summary judgment was improper. Genuine issues of material fact exist and the Vosses were not entitled to judgment as a matter of law. That leaves only the third issue presented— whether the "one free bite" rule should be abrogated. We will begin to answer that question by again quoting Professor Prosser:

> [T]he often repeated statement that "every dog is entitled to one bite" is not and never has been the law. It is enough that the dog has manifested a vicious disposition, and a desire to attack or annoy people or other animals.

Prosser, Torts, *supra*, § 76 at 501–02 (footnote omitted). "One free bite" has simply become shorthand for the proposition that strict liability does not arise until the animal's owner has knowledge of a dangerous propensity in the animal. In other words, what we are really talking about when we talk about abrogating the "one free bite" rule is abrogating the *scienter* element of the strict liability cause of action. Such abrogation would result in true strict liability—the owner of any dog that bit would be liable for the damage. Needless to say, such a change would fundamentally alter the gist of the tort, which presently is "the keeping of a thing known to be dangerous . . . ." *Id.* at 502.

This Court repeatedly has stated that the common law is dynamic, rather than static, and that it may be modified by judicial decision to meet the changing needs of society. *Weaver v. Mitchell*, 715 P.2d 1361, 1368 (Wyo.1986); *McClellan v. Tottenhoff*, 666 P.2d 408, 410–11 (Wyo.1983); *Collins v. Memorial Hosp. of Sheridan County*, 521 P.2d

---

6. A rule to the contrary would be ludicrous. For example, the owner of a dog should not be allowed idly to sit by and watch a small child abuse that dog to the point that the dog bites the child, simply because the dog has never bitten anyone before. Similarly, an owner who fails to feed his dog, to the point of starvation, should not be immune from liability if that dog kills and eats a neighbor's chickens, just because the dog has never before killed and eaten a chicken.

1339, 1341 (Wyo.1974). Modification of the common law, however, runs counter to the doctrine of *stare decisis*. *"Stare decisis"* is Latin for "to stand by things decided." *Black's Law Dictionary* 1414 (7th ed.1999). That concept is the basis of Anglo–American common law. *Stare decisis* is implemented through reliance on "precedent," the latter term referring to "[a] decided case that furnishes a basis for determining later cases involving similar facts or issues." *Black's Law Dictionary, supra,* at 1195.

[¶ 25] This Court has previously considered the tension between *stare decisis* and the needs of a changing society:

" 'Today's decision is supported, though not compelled, by the important doctrine of *stare decisis,* the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion. That doctrine permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact. While *stare decisis* is not an inexorable command, the careful observer will discern that any detours from the straight path of *stare decisis* in our past have occurred for articulable reasons, and only when the Court has felt obliged "to bring its opinions into agreement with experience and with facts newly ascertained." ' "

*State v. Carter,* 714 P.2d 1217, 1228 (Wyo. 1986) (Urbigkit, J., dissenting, with which Cardine, J. joined) (*quoting Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 412, 52 S.Ct. 443, 449, 76 L.Ed. 815 (1932) (Brandeis, dissenting) and *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 624–25, 88 L.Ed.2d 598 (1986)). Similarly, in *Worthington v. State,* 598 P.2d 796, 804 (Wyo.1979), we declared that "[w]ithout exercise of judicial restraint in this area, the law would lose its stability and certainty, which is the basis of a well-ordered society and the keystone of a stable and orderly system." In recent years, we have often cited *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), for the proposition that

*stare decisis* "furthers the ' "evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." ' " *State ex rel. Wyoming Workers' Compensation Div. v. Barker,* 978 P.2d 1156, 1161 (Wyo.1999) (*quoting Goodrich v. Stobbe,* 908 P.2d 416, 420 (Wyo.1995) and *Cook v. State,* 841 P.2d 1345, 1353 (Wyo.1992)).

[¶ 26] We have not, however, adhered blindly to the principles of *stare decisis* and applied precedent. We have also recognized the need for the common law to keep pace with the times:

" 'That court best serves the law which recognizes that the rules of law which grew up in a remote generation may in the fullness of experience be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this character should not be left to the Legislature.' "

*Jivelekas v. City of Worland,* 546 P.2d 419, 428 (Wyo.1976) (*quoting Dwy v. Connecticut Co.,* 89 Conn. 74, 99, 92 A. 883, 891 (1915)). As often as we have cited *Payne,* we have also said that *stare decisis* is not a law, but a policy, and we should depart from precedent when necessary " ' "to vindicate plain, obvious principles of law and remedy continued injustice ...." ' " *Barker,* 978 P.2d at 1161 (*quoting Goodrich,* 908 P.2d at 420 and *Jones v. State,* 902 P.2d 686, 692–93 (Wyo.1995)); *Dunnegan v. Laramie County Com'rs,* 852 P.2d 1138, 1140 (Wyo.1993); *Cook,* 841 P.2d at 1353. Simply stated,

"[w]e can agree that a rule of law which is merely the product of judicial decision, born of the necessities of particular circumstance, is subject to judicial repudiation when the reasons which gave rise to

its judicial adoption have failed or no longer exist . . . ."

*Jivelekas,* 546 P.2d at 431 (*quoting Maffei v. Incorporated Town of Kemmerer,* 80 Wyo. 33, 338 P.2d 808, 816 (1959), *overruled on other grounds by Collins,* 521 P.2d at 1344)).

[¶ 27]   Not surprisingly, Carmen urges us now to take the expansive view that we espoused in *Weaver:*

> " * * *   The main characteristic of the common law is its dynamism.  It does not remain static.  The common law is not a thing of chiseled marble to be left unchanged for centuries.
>
> > " 'Inherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of *stare decisis,* which, if correctly understood, was not static and did not forever prevent the courts from reversing themselves or from supplying principles of common law to new situations as the need arose.  If this were not so, we must succumb to a rule that a judge should let others "long dead and unaware of the problems of the age in which he lives, do his thinking for him." . . .' "

*Weaver,* 715 P.2d at 1368 (*quoting Lewis v. Wolf,* 122 Ariz. 567, 596 P.2d 705, 706 (1979), *overruled on other grounds by Ontiveros v. Borak,* 136 Ariz. 500, 667 P.2d 200, 208 (1983)).  Also not surprisingly, the Vosses argue to the contrary the important role of *stare decisis,* as set forth in *Adkins v. Sky Blue, Inc.,* 701 P.2d 549, 551 (Wyo.1985):

> The common law has served us well because it is flexible, able to grow and meet the requirements of changing conditions and a different society.  There are times when change is necessary; but the doctrine of *stare decisis* is also important in an organized society.  Change, therefore, should occur slowly, deliberately after much experience, and if possible so as not to affect vested rights or things in the past.

[¶ 28]   Several states have repudiated the *scienter* element in dog bite law.  *See, for example, Mulcahy v. Damron,* 169 Ariz. 11, 816 P.2d 270 (1991); *Stroop v. Day,* 271 Mont. 314, 896 P.2d 439 (1995); *Nickell v.*

*Sumner,* 1997 OK 101, 943 P.2d 625 (Okla. 1997); *S.H. By and Through Robinson v. Bistryski,* 923 P.2d 1376 (Utah 1996); *State v. Bash,* 130 Wash.2d 594, 925 P.2d 978 (1996); and Ward Miller, Annotation, *Modern Status of Rule of Absolute or Strict Liability for Dogbite,* 51 A.L.R.4th 446, §§ 4, 7–10 (1987).   While it is true that these states have abandoned the *scienter* element and have adopted a "pure" form of strict liability, it is also true that they did so by statute, and not by court decision.  *See,* 4 Am.Jur.2d *Animals, supra,* § 101 at 438–39.  Oklahoma's statute is a typical example of such a statute:

> The owner or owners of any dog shall be liable for damages to the full amount of any damages sustained when his dog, without provocation, bites or injures any person while such person is in or on a place where he has a lawful right to be.

4 O.S.1991 § 42.1 (cited in *Nickell,* 943 P.2d at 627).   Other statutes pointedly reject the *scienter* requirement:

> Every person owning or keeping a dog shall be liable in damages for injury committed by such dog, and it shall not be necessary in any action brought therefor to allege or prove that such dog was of a vicious or mischievous disposition or that the owner or keeper thereof knew that it was vicious or mischievous . . . .

Utah Code Ann. § 18–1–1 (cited in *S.H. By and Through Robinson,* 923 P.2d at 1380); *see also Mulcahy,* 816 P.2d at 272 and *Stroop,* 896 P.2d at 441.

[¶ 29]   Statistics indicate that 4.7 million people are bitten by dogs annually in this country, and that 800,000 of those victims require medical attention.  Mary Randolph, *Dog Law* § 11/1 (4th ed.2001).   In *Larsen,* 626 P.2d at 561, we acknowledged our awareness of the serious injuries and even death caused by dogs.   Nevertheless, we concluded that "correctional action is a legislative matter," and we noted that in 1979 the state legislature had passed Wyo. Stat. Ann. § 11–31–301 (Cum.Supp.1980), which provided as follows:

> "(e) Any dog attacking any person in a vicious manner may be destroyed and the

owner or custodian of the dog may be fined not more than two hundred dollars ($200.00). Proof of the fact that the dog has bitten or attacked any person at any place where a person is legally entitled to be is evidence that the dog is vicious within the meaning of this act."

*Larsen,* 626 P.2d at 561 n. 3. This language remains in the statute today. Wyo. Stat. Ann. § 11–31–301 (LexisNexis 2001). Clearly, the legislature has not seen fit to create a tort duty of pure strict liability beyond the common law rule. As we recognized in *Larsen,* one of the considerations when a court is asked to modify the common law is whether the constitutional separation of powers doctrine requires that the matter be left to the legislature where the legislature has taken action. *Worthington,* 598 P.2d at 804.

[¶ 30] In an appropriate case, the common law may be judicially modified to create a new tort duty. *Andersen v. Two Dot Ranch, Inc.,* 2002 WY 105, ¶¶ 11–12, 44–45, 49 P.3d 1011, 1014, 1024–27 (Wyo.2002); *Gates v. Richardson,* 719 P.2d 193, 195–96 (Wyo.1986). " ' "Duty" is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.' " *Andersen,* 2002 WY 105, ¶ 44, 49 P.3d at 1024 (*quoting Gates,* 719 P.2d at 195). Whether a duty exists is a question of law. *Davis v. Black Hills Trucking, Inc.,* 929 P.2d 532, 534 (Wyo.1996). A duty may arise by contract, statute, common law, "or when the relationship of the parties is such that the law imposes an obligation on the defendant to act reasonably for the protection of the plaintiff." *Hamilton v. Natrona County Educ. Ass'n,* 901 P.2d 381, 384 (Wyo.1995). The legal question to be answered by the court is

" ' "[w]hether, upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant. This is entirely a question of law, to be determined by reference to the body of statutes, rules, princi-

ples and precedents which make up the law; and it must be determined only by the court." ...' "

*Thomas By Thomas v. South Cheyenne Water and Sewer Dist.,* 702 P.2d 1303, 1307 (Wyo.1985) (*quoting* Prosser, Law of Torts, § 37 at 206 (4th ed.1971) and *Caterpillar Tractor Co. v. Donahue,* 674 P.2d 1276, 1280 (Wyo.1983)).

[¶ 31] In deciding whether to adopt a particular tort duty, a court's focus must be much broader than just the case at hand:

"[T]he courts have merely 'reacted to the situation in the way in which the great mass of mankind customarily react,' and that as our ideas of human relations change the law as to duties changes with them. Various factors undoubtedly have been given conscious or unconscious weight, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, the moral blame attached to the wrongdoer, and many others. Changing social conditions lead constantly to the recognition of new duties. No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." Prosser & Keaton on Torts, § 53, pp. 357–359 (5th ed.1984).

" * * * The judge's function in a duty determination involves complex considerations of legal and social policies which will directly affect the essential determination of the limits to government protection. Consequently, * * * the imposition and scope of a legal duty is dependent not only on the factor of foreseeability ( [*Cunis v. Brennan* ] 56 Ill.2d 372, 375, 308 N.E.2d 617) but involves other considerations, including the magnitude of the risk involved in defendant's conduct, the burden of requiring defendant to guard against that risk, and the consequences of placing that burden upon the defendant. [Citations.]" *Nelson by Tatum v. Commonwealth Edison Company,* 124 Ill.App.3d 655, 662, 80 Ill.Dec. 401, 465 N.E.2d 513, 519 (1984).

*Mostert v. CBL & Assoc.,* 741 P.2d 1090, 1093 (Wyo.1987). In *Gates,* 719 P.2d at 196, we further detailed the factors to be considered:

Some of the key policy factors to be considered are: (1) the foreseeability of harm to the plaintiff, (2) the closeness of the connection between the defendant's conduct and the injury suffered, (3) the degree of certainty that the plaintiff suffered injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden upon the defendant, (7) the consequences to the community and the court system, and (8) the availability, cost and prevalence of insurance for the risk involved. *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334, 342, 83 A.L.R.3d 1166 (1976).

[¶ 32] These discussions of duty have been in the context of a negligence cause of action, but we see no reason that the same principles would not apply to a cause of action for strict liability. In adopting strict products liability, this Court considered similar policy factors and found, in particular, that the risk of harm should fall on the person best able to prevent that harm. *Ogle v. Caterpillar Tractor Co.,* 716 P.2d 334, 342–44 (Wyo.1986). Other factors, such as the extent of the burden on the defendant, the policy of preventing future harm, the magnitude of the risk, and the availability of insurance are equally applicable to strict liability.

[¶ 33] According to one authority, twenty states have statutorily adopted some form of dog bite strict liability.[7] To the contrary, only one state appears to have judicially abandoned the *scienter* element of the strict liability cause of action. In *Hossenlopp By and Through Hossenlopp v. Cannon,* 285 S.C. 367, 329 S.E.2d 438, 441 (1985), the Supreme Court of South Carolina stated the following rationale for its holding:

In 1978 in the case of *McQuaig v. Brown,* [270 S.C. 512, 242 S.E.2d 688 (1978)], the court alerted the bench and bar to the fact that the dog-bite law in this state was antiquated. See dissent in *McQuaig.*

The dog-bite law is of common law origin. It may be changed by common law mandate. The time has come when our rule must give way to the more commonly accepted rule of law indicated in other states by both case law and by statute.

When a child, as in this case, has been injured by the dog of another, the burden of damages, medical expenses, hospital, etc. must be paid by either the owner of the dog or the parents of the child. It is common knowledge that dogs have a tendency to bite. The owners know this and should be made to respond in damages when the dogs they keep do injuries to others regardless of whether the injury is a result of the first bite, the second or other bite.

Having made those pronouncements, the court adopted the following statement of law, which statement had its origin in a statutorily-based California jury instruction:

[T]he owner of any dog which bites a person while such person is on or in a public place or is lawfully on or in a private place, including the property of the owner of such dog, is liable for such damages as may be suffered by the person bitten regardless of whether or not the dog previously had been vicious, regardless of the owner's knowledge or lack of knowledge of any such viciousness, and regardless of whether or not the owner has been negligent in respect to the dog, provided, however, that if a person knowingly and voluntarily invites attack upon himself [herself], or if, when on the property of the dog owner, a person voluntarily, knowingly, and without reasonable necessity, exposes himself [herself] to the danger, the owner of the dog is not liable for the consequences....

*Hossenlopp By and Through Hossenlopp,* 329 S.E.2d at 441. Two of the five justices on the South Carolina Supreme Court concurred in the result in *Hossenlopp,* but disagreed with adoption of the California law. One justice argued that existing law should

---

7. Arizona, California, Connecticut, Florida, Georgia, Iowa, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nebraska, New Hampshire, New Jersey, Ohio, Oklahoma, Rhode Island, Washington, and Wisconsin. Annotation, *supra,* 51 A.L.R.4th, §§ 7–9 at 457–62. As we have noted herein, Utah should also be added to that list. There may be others.

remain in effect "until the General Assembly sees fit to liberalize it." *Id.* at 442 (Harwell, J., concurring). The second justice contended that "[t]his case is not the proper vehicle for such a far-reaching change in the law." *Id.* (Gregory, J., concurring). Apparently, the South Carolina legislature agreed with Justice Harwell. In 1986, it passed S.C.Code Ann. § 47–3–110 (1987), which is a detailed strict liability statute.[8] *See Elmore v. Ramos,* 327 S.C. 507, 489 S.E.2d 663, 664–65 (1997).[9]

[¶ 34] For several reasons, we conclude that, at least for this particular case at this particular time, the correct position is that taken by the dissenting justices in *Hossenlopp.* We decline to abrogate the *scienter* element of common law strict liability in dog bite cases. To begin with, we continue to believe that it would be better for the matter to be addressed by the legislature, just as it has been in many other states. The legislature is a deliberative representative body, designed for policy debates, and designed for constituent input. As is evidenced by the cases and statutes cited herein, there are many ways to fashion a dog bite law. In some states, for instance, the statute applies only in cities and towns. *See Stroop,* 896 P.2d at 441 and *Nickell,* 943 P.2d at 627. Given Wyoming's vast rural areas and its numerous working ranch dogs, that is a feature our legislature might want to contemplate.

[¶ 35] The second reason that we have determined in this case not to create judicially a pure form of strict liability is that this is not a situation where the appellant is left without any remedy. There are three existing theories of recovery in dog bite cases and this case will be remanded for trial on two of those theories. The appellant will have her day in court.

[¶ 36] Finally, although both sides in this case have mentioned and discussed to some extent the *Gates* factors, we do not feel that there has been sufficient factual development concerning many of those factors. We do not know how many dogs there are in Wyoming. We do not know how many of those dogs are kept in cities and towns or how many of them are kept in rural areas. We do not know how many dog bites there are each year in Wyoming. We do not know the nature and extent of the injuries caused by dog bites in Wyoming. We do not know whether liability insurance is available, whether it covers both negligence and strict liability, or what it costs.

[¶ 37] We are not insensitive to the plight of dog bite victims who cannot prove negligence on the part of the dog's owner and who cannot prove the owner's prior knowledge of the dog's dangerousness. We are also mindful of the fact that the common law may be judicially modified under appropriate circumstances. But for all the reasons set forth above, we will not in this case abrogate the *scienter* element of strict liability.

## CONCLUSION

[¶ 38] The summary judgment entered in this case must be reversed because there are

---

8. The statute reads:

    Whenever any person is bitten or otherwise attacked by a dog while the person is in a public place or is lawfully in a private place, including the property of the owner of the dog or other person having the dog in his care or keeping, the owner of the dog or other person having the dog in his care or keeping is liable for the damages suffered by the person bitten or otherwise attacked. For the purposes of this section, a person bitten or otherwise attacked is lawfully in a private place, including the property of the owner of the dog or other person having the dog in his care or keeping, when the person bitten or otherwise attacked is on the property in the performance of any duty imposed upon him by the laws of this State, by the ordinances of any political subdivision of this State, by the laws of the United States of America, including, but not limited to, postal regulations, or when the person bitten or otherwise attacked is on the property upon the invitation, express or implied, of the owner of the property or of any lawful tenant or resident of the property. If a person provokes a dog into attacking him then the owner of the dog is not liable. [ (1986 Act No. 343) ] S.C.Code Ann. § 47–3–110.

9. In 2001, South Dakota declined an invitation to follow *Hossenlopp* on the ground that the "overwhelming majority of states that impose strict liability for injuries caused by dogs have done so through legislative mandate." *Gehrts v. Batteen,* 2001 SD 10, 620 N.W.2d 775, 779 (S.D.2001).

genuine issues of material fact in regard to both causes of action and because the Vosses were not entitled to judgment as a matter of law.

[¶ 39] Reversed and remanded for further proceedings consistent with this opinion.